Good morning, your honors. My name is Milagro Cisneros. I'm an attorney with the Federal Public Defender's Office in Phoenix. At defense counsel table is my co-counsel, Susan Anderson. May it please the court, good morning. The conviction in this case should be reversed and a new trial granted because the jury heard unreliable expert testimony that materially affected the jury's verdict. The defense warned the trial court that the testimony was unreliable and asked for a pretrial daubered hearing to show it. The court denied a hearing and on top of that did not even make the required reliability determination. When the unreliable testimony came in, the expert invented a heretofore unknown level of certainty of knowledge without a doubt as to her conclusions. And when the defense expert was prevented, and then the defense expert was prevented from commenting on this. Because of these errors, alone or together, this court should reverse. Let me ask you at the outset, what was the theory of defense at trial? The theory of defense at trial was, your honor, that the, that first off, that the government could not show that this arson had been committed intentionally. There was a lot of evidence that came out at trial that could have been potentially reckless conduct by Mr. Eschiff that caused the fire. So as a consequence of that, the error of permitting the expert to testify and for the expert to testify in such a manner that indicated, that invaded the province of the jury really, by indicating or telegraphing to them that she somehow knew what his intentions were, that he intended to set a fire, was extremely prejudicial. So that was it. There's no question that he set the fire. The defense is simply that it was not an intentional act? No, your honor. We do not know. And in fact, that was not. That's why I asked the broad question. Because I just, to be honest, I go through this, it seemed to me that there's a different defense theory on every page. And you can't really go to a jury on that. There has to be some core comprehensible theory. Now, you can contest everything, but that's why I asked at the outset, just what is it that the defendant is asserting as his defense? Your honor, the defendant asserted as his defense that we didn't know. We couldn't say, our expert, the defense's expert couldn't say that he knew that the fire was accidental. He couldn't say that. He said that his conclusion was that the cause of the fire was undetermined. So as a consequence of that, then, to have an expert testify as to knowledge I'm trying not to get into the argument. I'm just trying to pin down what's in dispute. We've now had the same thing said in a couple different ways, that it's not intentional, it could have been accidental. Go back to the other obvious question. Was there any dispute as to whether the defendant had been the catalyst or the person who started the fire intentionally or not? Was there any other suspect, any other possibility identified? No, your honor. There was nobody else. So we know it's the defendant. As far as the jury's concerned, yeah, it could have been somebody we'd never heard of before, but at the end of the evidence, there's no other candidate that's offered up to the jury. That's correct, your honor. There's nobody else. So it's all about the intent. It is all about the intent, exactly. So, your honors, then, as you consider this issue, then, having these errors before you, then, would you turn to, then, as a harmless error analysis? Yes. Before you leave your issue on saying without a doubt or beyond a doubt, that's a concerning statement for an expert. But there's two questions I want to ask. One, hadn't prior to that time counsel asked, opposing counsel asked, something about in the report you're only supposed to say probable cause or something? Yes, probable or possible, your honor. Possible or probable. Yes. And so they're cross-examined on that. Why hasn't that opened the door for the witness to say what she really believes, even though maybe she wouldn't had she not been examined under cross-examination? Your honor, because ---- Has that door been opened? Your honor, it was improper for her to state her conclusion in such terms. And the reason why it was improper for her to do so was because she had knowledge of the defendant, and it was the manner in which she testified about it. She said it was based upon Anne records that she had seen. There's no question about that.  But after cross-examination of why you didn't just stay with probable, can't she say what she really believes? Well, your honor, I suppose that she could have said what she really believed, but we should have also been allowed to ask our expert whether that was proper for an expert. Okay. So when you get to that point, then to get it before the judge, you object and bring a motion to strike. Was that done? No, your honor. That was not done. So the judge never got a chance to clean this up. The judge could have instructed the jury to disregard all of that, could even admonish, but the judge never had that. So why are you able to show clear error at this point with that foreclosure? Your honor, the court, the manner in which the prosecutor objected was to say that it was improper, that the question was improper. At that point, the court sustained the objection, and that was closed off. That avenue was closed off. Wait a minute. You're talking the question now about what was ruled improper. Your honor, when defense counsel requested to ask the expert to comment on the propriety of expressing a standard or an opinion as absolutely sure or without a doubt, knowledge without a doubt, counsel objected, the government objected, because this was on cross-examination. The government objected, and then the government stated in its objection it's improper, and then the court sustained that. Okay. But the motion to strike was never made. So the testimony was still there. The motion to strike was never made. However, your honor, I would urge and I would suggest that this issue of invading the province of the jury is very serious, and that even on a plain error standard, even if nobody objected, the information that was imparted seriously compromised the integrity of the trial. Now, you say it was seriously, and that's true, but clear error requires a little more than that. How would you say that your evidence, your feeling, or your argument, I should say, that this is clear error is based upon what? Your honor, I, by her choice of language, she told the jury what to decide. And that is improper under any standard. Okay. It's error. So now, but that isn't enough, because if you put it before the trial judge, then we rule on it whether it was error or not. That's easy. Then we get to the clear error, because there was no objection in motion to strike. How is this clearly erroneous, clear error, under our cases? Your honor, I know without a doubt that this was an intentionally set fire, clearly invaded the province of the jury. Did she say who set it? She did not say who set it explicitly, but she left little doubt as to who set it, because she also testified that she had, she was aware that Mr. Eschiff had confessed to setting the fire. She testified that he, she was aware that he had a motive for setting the fire. And she also stated, importantly, that she factored this information into her conclusion. So she, as a consequence, conveyed her certainty that Mr. Eschiff was the person who intentionally started the fire. And only the jury can make that decision. I suppose the opposition is going to say, well, that's harmless even if it's erroneous, because he later confessed. Now, assuming that that stays in, I know your argument. Yes, Your Honor. But assuming it stays in, would that be true, that it would be harmless under the circumstances of the case if the confession were allowed to stay in? No, Your Honor. It would not be harmless. An error is not harmless if it is more probable than not that it materially affected the verdict. Here, Mr. Eschiff's statements. Now, I can step back a little bit. It is not inconsistent with his statements, what he said, that these could have encompassed reckless actions. I should say that at the outset. The jury, furthermore, heard ample evidence that would have caused them to doubt the reliability of his statements to Firefighter Acosta. He had just been escorted by police in handcuffs from a burning building. He had just been in a burning building and was being treated for smoke inhalation. He was drunk. There was information that he had been behaving irrationally. He was agitated. He had had 18 beers that day. He made statements, furthermore, that were patently untrue, and verifiably so. For instance, that his children were in the house when they were not. So that's one. These things could have caused a reasonable jury to discount or to doubt the reliability of Mr. Eschiff's confession. Also, in addition, what's left after discounting the expert's unreliable testimony, we have our expert, or the defense's expert, who stated that the cause of the fire was properly classified as undetermined, that it was a possible electrical fire. There was a ceiling fan that was never taken into account. And then, of course, there's also Mr. Eschiff's actions prior to the fire having to do with his neighbor, Rene Uriarte, and that, too, could be consistent with reckless or negligent conduct. So, Your Honors, there are three pieces of evidence that we're left with for harmless error analysis, and all of them could be easily consistent with reckless conduct. Absent Ms. Everett's testimony, the jury could have concluded that Mr. Eschiff's conduct was reckless, negligent, but they had to conclude that it was intentional, that he set his house on fire intentionally in order to find him guilty of arson. Your Honors, I apologize. I forgot to mention that I wanted to reserve some time, and if I may at this point, I'd like to ask to do so. Okay. Thank you. Thank you. Well, I do have a particular interest, as well, in the custodial interrogation issue. Sure thing. And in particular, since I'll sort of launch that one, I'll focus on custody. It's been the position expressed by the government that this was not custodial interrogation, at least in part, because he was not in custody. Is that correct? Yes, it is, Your Honor. How was it he's not in custody? What we forget is that they have to be in custody of the law enforcement, so we have that. He's not in the custody of the police. In fact, Your Honor, I would like to show that he isn't in custody at all. He has been seized by the police, brought to the ambulance for treatment. So he's not in the custody of law enforcement without that. As I understand the facts, the police grabbed him as he tried to reenter the house and prevented him from doing so. Yes, twice. Put him in handcuffs. Yes. Took him to the ambulance or whatever the rescue vehicle was. Yes. And stood guard outside while he was inside. Well, that is not a correction, Your Honor. Okay. Counsel makes a large deal that he was being guarded by the police. The police were outside because that was where they were working. That's where the fire was. There was no testimony that any officers stood guard outside the ambulance so that he couldn't escape the ambulance. Well, having been brought to the ambulance in handcuffs and then put inside the ambulance, would an objective observer in his position feel that he was free to go at will? Yes, Your Honor. First of all, just being in handcuffs, the case law says that in and of itself doesn't approve custody. He was brought there for medical attention. The handcuffs were removed once he was in the ambulance. When you look at the objective circumstances from a reasonable person's point of view, he's in the ambulance not because the police are trying to keep him there for law enforcement purposes, but to obtain medical treatment. When the EMT Langolf was done with his examination, he asked the defendant if he wanted to go to the hospital. He said he didn't want to, and he wasn't forced to go to the hospital. So he wasn't in custody in the sense of Miranda. And beyond that, even if you say that he was seized in custody, he's not in the custody of law enforcement, which is the whole purpose of the Miranda rule. So he's simply not, he's not, the government would maintain he's factually in custody. And even if this court were to find that he was factually in custody of the government, he certainly is not in custody of the law enforcement for purposes of Miranda. Beyond that, he was not interrogated by law enforcement. The EMT Acosta, who knew the defendant from the past, in order to engage the defendant's ongoing mental acuity, asked him what was going on. Counsel has argued in the brief that Acosta conceded that he wasn't asking the question for medical purposes. But as I detailed in the brief, Acosta maintained even after strong questioning from the trial court that he was asking the question for medical purposes. And even if it was not for medical purposes, as long as the question is not directed or authorized by law enforcement, there's no question of interrogation. The defendant himself didn't even think that Acosta was part of law enforcement because when Acosta asked him what was going on, he looked around to make sure that there weren't other people there. So even the defendant himself didn't think that he was being interrogated by law enforcement. There is simply no Miranda issue here. I'll return to the Daubert issue. As the government has conceded in the brief, should have made an explicit finding on the reliability of the experts' methodology. But the error is certainly harmless here because no one disputed the government's experts' qualifications and both the government's experts and the defendant's experts agreed that the proper, valid scientific methodology to be used here was the procedure set forth in the annual PA 9 of 21. There was great dispute over the government's experts' conclusions from applying the proper methodology. But those are questions for the jurors to resolve, not the court. The defendant's primary argument here is that the government's expert error didn't follow the annual PA 9 of 21 procedure by using the process of elimination because the expert was incorrect that the origin of the fire was clearly defined. That is simply a factual dispute. The defendant's expert testified that it wasn't sufficiently clearly defined to be able to use the process of elimination. Judge McAmeer was in no better position to make that determination than the jurors were because that's a factual question. As I just stated, everybody agreed that the government's expert was qualified and everybody agreed that the proper procedure was the annual PA 9 of 21 process. How that process came out, the conclusions that were garnered, were clearly in dispute because the defendant was able to present his own expert. So that was probably for the jury to decide. I'll move on to the question of the expert's testimony about setting the fire intentionally. It is clear that an expert can testify to manage to embrace the ultimate issue. The government's expert testified that after her investigation and talking with the fireman and the people who were there at the fire, that the fire was set intentionally. She did not testify that the defendant intentionally set the fire. This is no different than the Junger case that I cited. There was little doubt that the defendant in that case owned and possessed a backpack in which the cocaine was found. As long as the expert does not give the ultimate conclusion that the defendant intentionally did the act or in this case set the fire, there is no problem. As Judge Wallace noted, we can't look at this simply from the point of view of did the trial court err in admitting this evidence? Should the court find error? But the court has to find that it was clear error. And then it's such a high burden here that even if this were somehow error and the government maintains that it's not, but if it was the expert, was she entitled to form any part of her opinion as to the cause of the fire based upon outside information such as eyewitness statements? There's no indication from the record, Your Honor, that that's not permissible. You say there's no indication that she did? No. There's no indication that that's impermissible to do that. Does the government take the position that it was all right for her to include eyewitness statements of interviews along with her investigation to make a determination that the fire was intentionally set? And, Your Honor, I'm not aware that that's impermissible to do so. That was simply brought out at trial. Your position is, I take it, that when this expert comes in, she may not only consider what she found at the fire, but she can go read the police files and the evidence and statements and include all of that in making a determination that it was intentionally set? Yes. There's nothing that I'm aware of that's improper. I may be mistaken, Your Honor, but I believe she detailed at the beginning of her report all of the things that she considered in coming to her expert opinion. There's this protocol or whatever it is that is referred to in the case about somebody, a group of experts getting together and determining how an expert should testify at trial. I'm not familiar with that. This is the first time I've seen it. Is this a statute or is it government-controlled or is it completely private among private experts making decisions? I believe what you're talking about, Your Honor, is the International Fire Protection Association Policy 921. It was certainly new to me when I first started working on this case. As I understand it, the International Fire Protection Association is a group of experts on the causes and origins of fire. I believe it to be a private organization. That's what I assumed. It was a private group of experts saying this is the dos and don'ts of testifying. And I assume from your statement that this is not government-recognized as a regulation or a statute. This is private. Yes. How is it used at trial? That is, somehow this got in and the expert's being criticized because she jumped over what the expert's determination was of how people should testify. How is it introduced at trial and used at trial? It was admitted under Daubert, Your Honor, that it is a scientifically valid methodology that would be useful to the jurors in determining the cause and the origin of the fire. As I said at the beginning of my argument, the court should have made an explicit finding that the NFPA 921 process was scientifically valid under Daubert. But because both the government expert and the defendant agreed that this was the appropriate methodology, the talk was harmless in this case. So this particular document then, if I understand you correctly, was used in the Daubert approach of whether the person is an expert to testify, not for purposes of attacking testimony later? I'm not sure I understand your question, Your Honor. The government expert was very closely and very strongly cross-examined by the defendant's counsel on whether she properly followed the NFPA 921 process. And to the extent that the government expert didn't follow that process, that was fully explored before the jurors. Does the protocol call for the expert to testify in a specific way? That is, for example, they can say it's probable or unprobable, or does the protocol direct how experts are to testify before the court? As I understand the protocol, the expert may determine after his or her investigation of the fire that an origin or cause of the fire was probable or possible. And it doesn't speak to any other standards than those. The defendant's counsel makes the point strongly, or urges it strongly, that the expert here erred because she used a standard that was not contemplated by 921. But the government expert did testify that her standard was probable for purposes of 921. To the extent that the expert used a higher standard, and she turned it absolutely certain that that could only benefit the defendant because she wouldn't make her conclusions based merely on probability, but on absolute certainty. So to the extent that she erred in using a higher standard, I'm at a loss to see how that pertains to the defendant at all. So your position is the protocol requires them to go a certain way, a certain way up the scale, but there's nothing in the protocol that's violated if they have evidence that can go higher. That is, instead of probable, going up to without a doubt? My answer would be that going higher than probable is not contemplated by the policy, but the defendant would only benefit by an expert's use of a higher standard. Okay. Thank you. Thank you, Your Honor. Thank you, Your Honor. An expert's conclusions are not immune from scrutiny. The testimony in this case, the challenge testimony, what the defense was attempting to do was to inquire into the defendant's as to whether the expert applied the principles and methods that she purported to be applying reliably to this case. That is prong three of Federal Rule of Evidence 702. In addition, as noted in the defense's briefing, under the Mitchell case, testimony is unreliable because any step of the investigation in the investigation process misapplies a reliable methodology, number one. Or number two, because the expert changes the methodology somehow. In this case, utilizing the process of elimination changed a reliable methodology. I apologize, it misapplied a reliable methodology. And the use of this extra certainty standard changed a reliable methodology. The methodology that everybody agreed was to be used in this case was the NFPA 921, and as counsel correctly points out, this is a group of arson investigators,  the issue of probable or possible is not about whether the expert comes into court and testifies as such. The issue is that the conclusions are probable or possible. And that is our problem here, the conclusions were in error because the methodology was applied incorrectly. I just don't understand that. I mean, why is it that what a private group defines as what's useful for their purposes necessarily limits the degree of certainty that a witness may express in court, which is concerned with a different set of standards? Your Honor, the problem is not, that is not really the problem here. The problem here is that the standard that she chose, by the manner in which she expressed it, invaded the province of the jury. There are two different things going on here. I understand the issue that says that she shouldn't be speaking directly to the issue of whether it was intentional or not. I'm not saying that I necessarily agree, but I understand. This is something else. This is the level of certainty, the opinion that's being expressed. And I still don't understand what's wrong with a witness saying, I am absolutely certain, let me burn in hell if I'm wrong. Just because the professional group happens to articulate probable and possible, those aren't standards that are particularly useful to the court. Now, what she articulates may not be especially useful either. But what makes that wrongful? What makes it erroneous? Your Honor, it was erroneous because of the manner in which she testified to it. She testified to it bringing those two issues together. And that's why it's not, it can't really be divorced from the problem of invading the province of the jury. Because she said, I am in the same breath practically. I testify, I can tell you with absolute certainty, I know without a doubt that this fire was set intentionally. As you questioned me earlier about this, there was nobody else who could have done it. So those two issues really can't be divorced, Your Honor. Fairly can't be divorced. I also want to briefly address. Very briefly. Yes, very briefly. I apologize, Your Honor. I do see that my time is up. I don't know if you would like me to address these. You've got 30 seconds. Okay, thank you, Your Honor. In terms of the Younger case that the government cites, this case is distinguishable from Younger. Because the expert in Younger disavowed any knowledge of the defendant. In this case, as noted previously, she indicated that she did know who it was. So that is not the same here. In addition, in relation to the custody issue, I point the Court to the cases that we've cited, Mathis, Estelle, and Sarancic, in which there was no clear law enforcement purpose, but the Court indicated that under Miranda it was not permissible to allow that testimony in. Thank you. I have a question that would be on my time, not yours. Thank you, Your Honor. In address to an earlier point discussed, I want to make sure I understand it. The defendant's expert agreed that Deputy Marshal Evert was a qualified witness. He agreed that she had qualifications, yes. Yeah, all right. And both she and the defense expert used the same methodology. They used a manual that is called the NFPA 921. Yeah. I think they agreed they were using the same methodology. They agreed that they were using the same methodology. So we've got two experts who are using the same methodology, have reached different conclusions. Why isn't that just simply a matter for the jury? Your Honor, it's not simply a matter for the jury because Mitchell tells us and Rule 702 tells us that when there is unreliable testimony, there is unreliable testimony if there is a misapplication of the methodology. The fact that they both used the NFPA 921 does not necessarily mean that the government's expert used that methodology properly. It's as if you had a book of surgery. There is a methodology for gallbladder surgery, a methodology for resecting a bowel. You have a patient that needs gallbladder surgery and you use the methodology for resecting a bowel and then you try to say that you did a good job. Okay. Thank you. Thank both counsels for the argument. The U.S. v. Mississippi case is submitted.
judges: Wallace, Hug, Clifton